UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RANDLE GRIFFIN,

        Petitioner,

                                            Case Number 07-14402
v.                                          Honorable Thomas L. Ludington

CAROL R. HOWES, *Warden*,

        Respondent.
_____/

**ORDER ADOPTING REPORT AND RECOMMENDATION, OVERRULING PETITIONER'S OBJECTION, AND DENYING PETITION FOR WRIT OF HABEAS CORPUS**

On October 16, 2007, Petitioner Randle Griffin filed a petition for writ of habeas corpus challenging the constitutionality of his conviction for second degree murder and possession of a firearm during the commission of a felony. Petitioner was sentenced to a term of parolable life imprisonment for the murder conviction and a mandatory consecutive term of two years' imprisonment for the felony firearm conviction. On January 28, 2009, Magistrate Judge Paul J. Komives issued a report and recommendation that the Court deny the petition for writ of habeas corpus, the motion for an evidentiary hearing, and the motion for appointment of a blood splatter expert. After considering the pleadings, the report and recommendation, and Petitioner's objection, the Court will **ADOPT** the report and recommendation and **OVERRULE** the objection.

I

A

The facts underlying Petitioner's conviction are as follows:

      The deceased, Norris Brown, died of a single shotgun wound to the upper chest (Vol I, pp. 187-197). There was no evidence of close range firing (Vol I, p. 198). The deceased had ingested cocaine prior to his death (Vol I, p. 201). The

assistant medical examiner was unable to determine the kind of gun used to inflict the fatal wound (Vol I, p. 207).

Responding officers found the deceased laying face-up in the front doorway of 8005 Lawton, suffering from a gunshot wound (Vol II, p. 352). Crack cocaine was removed from the deceased's clothing (Vol II, p. 358).

Evidence technicians found little droplets of blood just outside the front of 8005 Lawton, Detroit (Vol II, pp. 231, 234). A pool of blood was found in the foyer (Vol II, pp. 233-234).

SHAWN DANIELS testified that sometime after the shooting he heard a conversation between Defendant Griffin and Chris (Vol II, 262-263). When Daniels first asked Defendant Griffin if he knew anything about the shooting, he said he did not (Vol II, p. 264). Later in the evening, Daniels allegedly overheard Defendant Griffin say he shot the guy (Vol II, pp. 268, 284). Chris then described what happened during the shooting (Vol II, pp. 284-285). Daniels admitted that prior to the conversation, he had ingested four of the five packs of heroin during the day and drank some forty ounce beers (Vol II, pp. 278-279, 319). He further admitted lying to the police while in custody and eventually told the police about the conversation because they pressured and threatened him into telling (Vol II, pp. 283, 300, 308). When he eventually told the police about the conversation, he was high on heroin, cocaine and alcohol (Vol II, p. 274). Daniels was a convicted felon who was on probation (Vol II, pp. 298-299). He admitted being a heroin and cocaine addict (Vol II, p. 318). The police told Daniels that if he made a statement implicating Defendant Griffin, he would be released (Vol II, p. 325). Daniels admitted implicating the Defendant so he could be released (Vol II, pp. 325-326). Finally, Daniel's conceded that Chris may have said he was the one who did the shooting (Vol II, p. 322).

The responding officers arrested a DeWAYNE HARRIS based on information that he was seen at the scene with a shotgun (Vol II, pp. 368-369, 373). Harris had blood on his shorts when he was arrested (Vol II, p. 373; Vol III, p. 615).

LINDA JONES, a neighbor to the Lawton house saw two young men, one with a shotgun, standing outside the front door (Vol II, pp. 392-396). Jones was about seventy (70) feet away from the men looking out a bedroom window (Vol III, pp. 403, 477). Jones saw a person walk down the inside apartment stairs. This man was shot (Vol III, pp. 400-409). The two men ran off, but one returned to the front door (Vol II, p. 410). This man went through the deceased's pockets and removed or put something in it (Vol II, pp. 411-412). Jones identified Defendant Griffin as the shooter (Vol II, p. 426). The shooter turned just before firing the fatal shot (Vol III, p. 461). At a photographic array, Jones told the police that Defendant Griffin "looks like" the person who was holding the weapon (Vol III, p. 471).

GARY HOLT, a friend of the deceased, overheard Defendant Griffin ("Ren") say he was going to do a stick up, but could not get inside the house to do it (Vol III, p. 513). When the person refused to lay down when ordered to, Defendant shot him (Vol III, p. 514). Later, Holt found out that Norris Brown had been shot, so he called the police and told them what he overheard (Vol III, pp. 518, 522).

The officer in charge, DONALD STAWIASZ, testified that he presented a not-in-custody warrant to a prosecutor who signed the recommendation and was reviewed by a judge, before being issued for Defendant Griffin (Vol III, pp. 550-551). In July, after Defendant was arrested, Stawaisz interrogated him and took a statement. In this statement, Defendant Griffin said a friend Darius Turner came to his house. Turner complained that a guy on Lawton "kept fucking with him" and asked Defendant to go to the house to "holler at the guys." They picked up Chris and another unknown man and drove around drinking. Inside the car was a riot pump shotgun. The men decided to "fuck up" the guys Turner had a disagreement with. Chris put the shotgun in his pant leg and walked up Lawton with Defendant. Defendant said he was intoxicated at the time. Both men entered the building, but could not locate the man they were looking for. As they were leaving, Defendant recognized the man they were looking for and took the gun from Chris. When he reached into his waistband, and put his hand on a handgun, Defendant shot him. Both men then ran to Turner's car nearby. Later, Chris said he took $40 off the man who was shot. Defendant Griffin denied planning to shoot the deceased.

YVONNE BALDWIN, Defendant's girlfriend, spoke to him about Brown's death in June or July (Vol III, pp. 623-624). After questioning him several times and not receiving an answer, Defendant Griffin eventually told Baldwin that a guy had got shot (Vol III, pp. 636-638). Defendant never said who shot the person or how he got shot (Vol III, p. 639). When Baldwin was informed by the trial judge that she could be charged with perjury after admitting she previously lied at the preliminary examination, she asserted her Fifth Amendment right not to testify (Vol IV, p. 654). Ultimately, the trial court struck all of her testimony (Vol IV, pp. 770, 813). A motion for mistrial was denied (Vol IV, p. 770). Over objection, the trial judge allowed the prosecution to have Ms. Baldwin's preliminary examination testimony read to the jury (Vol IV, pp. 807-809). In this previous testimony Baldwin said Defendant Griffin told her he had shot him, they went there to stick him up and took some money (Vol IV, pp. 819-821).

DARIUS TURNER, was driving his car when he picked up Defendant Griffin and two other men, one identified as Chris (Vol IV, pp. 667-671). Turner saw Defendant Griffin hand Chris a shotgun in the car (Vol IV, p. 674). Defendant Griffin asked a person the street where he could get some cocaine (Vol IV, p. 680). After driving around, Defendant Griffin and Chris exited the car. Chris had the shotgun in his jogging pants (Vol IV, pp. 684, 713). The two men disappeared down an alley (Vol IV, p. 685). About 15 minutes later, both men returned to the car, with Chris saying "I got him" (Vol IV, pp. 687, 694). Turner saw Chris with money in his hand (Vol IV, p. 695). Turner denied having a "beef" with anyone that day (Vol IV, p. 699).

THOMAS McKINNEY, was standing in front of a nearby store when the shooting occurred (Vol IV, pp. 723-726). A car pulled up and Darius Turner asked "who's selling dope upstairs" (Vol IV, pp. 727, 729). Later, while standing on the porch of his house, McKinney heard a shot come from across the street (Vol IV, p. 735). When McKinney looked, he saw one man with a shotgun saying "come on"

while another man was going through the pockets of a man lying in the doorway (Vol IV, p. 736). The men removed "some papers, money, or something" (Vol IV, p. 737). McKinney could not identify the two men. McKinney said that the man who was shot, "C" was selling drugs from the building (Vol IV, p. 742).

The defense called LUCILLE JONES, the girlfriend of DeWayne Harris, who testified that in June Harris came in a taxi cab to her house (Vol IV, p. 858). Jones testified that Harris got blood on his clothing while having sex with her (Vol V, pp. 856-857).

GINA WILLIAMS, testified at trial consistent with her testimony at the Walker hearing concerning the arrest of Defendant Griffin (Vol V, pp. 860-884). Defendant Griffin took the stand and testified that on June 30, 1990, Darius Turner came by his house on Appoline (Vol IV, pp. 889-890). Defendant and Turner drove in Turner's car to Linwood and Lawton because a person was "going to jump" Turner (Vol V, pp. 891, 933). Defendant went to support Turner if there was a fight (Vol V, p. 893). After Turner spoke with this person, they left to pick up Chris (Vol V, p. 894). Chris and a[n] unidentified black male walked to the car and put something wrapped up in the trunk (Vol V, p. 897). Chris told Defendant Griffin that it was a rifle and that he wanted to sell it (Vol V, pp. 897-898). After having four or five drinks of cognac, Defendant Griffin became drunk (Vol V, pp. 899-900). When they stopped to purchase some crack cocaine, Chris asked the seller where he could sell the gun (Vol V, p. 901). When they were directed to a house on Lawton, Defendant, Darius and Chris exited the car, with Chris concealing the gun in his pant leg (Vol V, pp. 903-904). Defendant Griffin heard some arguing involving Chris and another unknown voice, followed by two gunshots (Vol V, p. 909). At the car, Chris handed the rifle to Defendant Griffin and told him to put i[t] under the seat, which he did (Vol V, pp. 910, 965). Defendant said he got the impression that Chris had shot someone, so he got nervous and panicked (Vol V, p. 911). Defendant Griffin denied shooting or trying to rob anyone (Vol V, p. 912). He further denied telling anyone that he had shot someone (Vol V, p. 914). Defendant explained how the police beat him when he was arrested (Vol V, pp. 917-919). At Police Headquarters he gave two written statements, the first consistent with his trial testimony (Vol V, pp. 922-923). After the police showed him witness statements and told him he did not believe his first statement, Defendant gave a second statement admitting to the murder when the officer said he would get only ten years (Vol V, pp. 926, 945).

On redirect, the following questions and answers occurred:

Q. All right. Did Investigator Stawiasz ever tell you that he was going to reduce this agreement that you and he made about the ten years to writing for you?

>   A. No.
>   Q. Did you expect him to?
>   A. I ain't never been through nothing like this. I thought he was going to go just to talk to the prosecutor like he said.
>   Q. Did you think he would live up to his word? (Vol V, p. 978).
>
> When the prosecutor asked to be allowed to cross examine Defendant regarding his response, the trial judge left it to the attorney's [sic] to resolve the issue without ruling (Vol I, pp. 983-986). The attorneys agreed to allow the prosecution to ask Defendant whether on three previous occasions in the last few years, he had been advised of his rights and questioned by the police (Vol V, pp. 986-987). Before the jury, the question was asked and Defendant Griffin answered "yes" (Vol V, pp. 988-989). The prosecutor argued this evidence in his rebuttal arguments (Vol V, p. 1050).
>   Rebuttal witness, Darrell Martin, testified that he was assigned to the Repeat Offender Unit of the Detroit Police Department (Vol V, p. 989). Martin testified that the arrest of Defendant Griffin was "without incident" (Vol V, p. 991). Martin denied that the arresting officers physically abused the Defendant (Vol V, p. 994).

Dkt. # 26 at 4-9 (quoting Def.-Appellant's Br. on Appeal, in *People v. Griffin*, No. 141530 (Mich. Ct. App), at 1-10).

B

After his conviction and sentence, assisted by counsel, Petitioner appealed to the Michigan Court of Appeals, raising seven assignments of error. Each of those arguments were found to be meritless, and the conviction and sentence were affirmed. Petitioner, acting pro se, then sought leave to appeal to the Michigan Supreme Court, but leave was denied.

On July 15, 1996, Petitioner raised several assignments of error through a motion for relief from judgment in the trial court pursuant to Mich. Ct. R. 6.502. The trial court denied the motion, concluding that Petitioner had raised each issue on direct appeal or had not demonstrated good cause for not advancing the claims on direct appeal. *See* Mich. Ct. R. 6.508(D).

Thereafter, Petitioner sought leave to appeal in the Michigan Court of Appeals and Michigan Supreme Court, arguing that the trial court abused its discretion in denying the motion for post-

-5-

appeal relief and advancing a claim for ineffective assistance of appellate counsel. Both courts denied the request.

Petitioner brought a second motion pursuant to Mich. Ct. R. 6.502, contending that he had discovered new evidence demonstrating actual innocence and the sentence imposed violated his rights under *Blakely v. Washington*, 542 U.S. 296 (2004). The trial court denied the motion because a party is entitled to only one motion requesting post appeal relief. *See* Mich. Ct. R. 6.502(G). Again, Petitioner sought review of this decision by the appellate courts, but the requests were denied. Petitioner then filed the instant petition, advancing the following claims:

> I. THE WAYNE COUNTY CIRCUIT COURT MISHANDLED THE MOTION FOR RELIEF FROM JUDGMENT AFTER [IT] HAD BEEN PENDING IN THE CIRCUIT COURT FOR ALMOST SIX AND ONE HALF YEARS. AFTER GRANTING AN EVIDENTIARY HEARING ON THE ACTUAL INNOCENCE AND INEFFECTIVE ASSISTANCE OF COUNSEL ALMOST THREE AND ONE-HALF YEARS EARLIER, WITH[OUT] HEARING DENIED THE REQUEST FOR RELIEF ON FALSE ASSUMPTIONS AND INAPPROPRIATE APPLICATION OF THE ISSUE PRECLUSION DOCTRINE.
>
> II. DEFENDANT WAS DENIED DUE PROCESS OF THE LAW BECAUSE OF THE REPREHENSIBLE CONDUCT OF THE PROSECUTOR IN THIS CASE.
>
> III. THE LOWER COURT AND THE MICHIGAN COURT OF APPEALS ABUSED ITS DISCRETION BY NOT ADHERING TO PRECEDENT OPINION IN LAMARBE AND GATEWOOD, MANDATING THAT RESENTENCING IS REQUIRED WHEN THE SENTENCE IS BASED SOLELY ON INACCURATE INFORMATION. APPELLANT WAS DENIED DUE PROCESS AND EQUAL PROTECTION OF THE LAW UNDER MICH. CONST. ARTIC[LE] I, SEC.2, WHERE THIS COURT FAILED TO FOLLOW MCR 7.215(C)(2), (J)(1).
>
> IV. DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT (A) SENTENCING AND (B) DURING TRIAL.
>
> V. THE MICHIGAN STATE COURT SYSTEM HAS DENIED DEFENDANT HIS DUE PROCESS RIGHT TO ESTABLISH HIS INNOCENCE OF THE CRIMES AND THEREBY ESTABLISH A GATEWAY TO PASS BY ANY ALLEGED PROCEDURAL DEFAULT.

The magistrate judge concluded that each failed for the reasons discussed below.  *See* dkt. # 26.

II

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, placed "a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  A petition for a writ of habeas corpus may be granted only if a petitioner can show that the state court's adjudication of the claims on the merits:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.  Conversely, "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  A state court need not cite Supreme Court cases on point or even be aware of such cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

"Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut

the presumption by clear and convincing evidence." *Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004) (citing 28 U.S.C. § 2254(e)(1)). This review is conducted in light of the law as it existed at the time of the final state-court decision, *Teague v. Lane*, 489 U.S. 288, 310 (1989), unless an intervening decision of constitutional import announces a "watershed" rule of criminal law with implications for the fundamental fairness of the trial proceeding. *Caspari v. Bohlen*, 510 U.S. 383, 395 (1994) (citation omitted).

### III

Petitioner's objection does not dispute the magistrate judge's description of the underlying facts of his conviction, description of the procedural history, or the standard employed. Rather, Petitioner disagrees with the magistrate judge's analysis with respect to each of his claims. Each shall be addressed in turn.

### A

First, the magistrate judge concluded that Petitioner's first and fifth claims were not cognizable on habeas corpus review because "a federal habeas court may not correct a state court's misapplication of its own law." Dkt. # 21 at 13 (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)). While Petitioner contends that the trial court violated his due process rights by not conducting an evidentiary hearing or employing procedures to address factual issues raised in his post-appeal motions, the magistrate judge noted that complaints concerning "post-conviction proceedings are outside the scope of federal habeas corpus review." Dkt. # 21 at 4 (quoting *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007)(citing *Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986))).

The objection contends that the magistrate judge misconstrued Petitioner's first and fifth

claims. While the magistrate judge viewed the claims as disputing the trial court's disposition of the post-appeal motions, Petitioner contends that the claims are instead focused on advancing a claim of actual innocence and that "[a] fundamental miscarriage of justice occurs when 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.' " Dkt. # 26 at 3 (quoting *Murray v. Carrier*, 477 U.S. 478 (1986)). *Murray* considered the proper circumstances to excuse a procedurally defaulted habeas claim. 477 U.S. at 497. While a default may be excused when a petitioner meets the actual innocence standard, *id.*, this exception is inapposite in the present circumstance. *Cress* stands for the proposition that the "scope of the writ does not reach [the] second tier of complaints about deficiencies in state post-conviction proceedings." *Cress*, 484 F.3d at 853(citing *Kirby*, 794 F.2d at 248). Notwithstanding Petitioner's claim of actual innocence, Petitioner's claims are grounded in a disagreement with state post-conviction procedures. *Murray* is applicable when a claim is procedurally defaulted, which did not occur with the first and fifth claims. Thus, the Court agrees with the magistrate judge that Petitioner's first and fifth claims are not cognizable on habeas review.

B

Next, Petitioner's second claim asserts that post-conviction affidavits by two trial witnesses, Turner and Daniels, demonstrate his innocence and are so compelling that rejecting their substance violates his due process rights. Dkt. # 26 at 3-4. The magistrate judge concluded that this claim should be denied because Turner's and Daniels's representation that they offered perjured testimony at trial lacks credibility and does not establish police-induced perjury. Dkt. # 21 at 17 (citing *Herrera v. Collins*, 506 U.S. 390, 423 (1993)). The magistrate also noted that Turner's affidavit lacks credibility because the assertion that his statement was coerced through "mental and physical

stress" is inconsistent with the fact that counsel was present during the police interview. *Id.* at 18. In addition, the magistrate judge noted that Daniels's affidavit discussed facts that were elicited at trial and considered by the jury. Consequently, Daniels's affidavit does not constitute newly discovered evidence.

Petitioner contends that the affidavits are indeed credible because they reveal that each was offered leniency or immunity for providing false testimony – a fact Petitioner emphasizes was not revealed at trial. While Petitioner acknowledges that newly discovered evidence is not cognizable for habeas relief, he reasons that the affidavits are "so compelling that it would be a violation of the fundamental fairness embodied in the due process clause . . . ." Dkt. # 26 at 4 (citing *Fairman v. Anderson*, 188 F.3d 635 (5th Cir. 1999)).

The *Fairman* court considered a circumstance where the only witness to an altercation recanted his testimony. 188 F.3d at 638. In that case, the witness's testimony was crucial to the petitioner's conviction because it was the strongest evidence contradicting the petitioner's claim of self defense. *Id.* The court concluded that the petitioner met his burden of demonstrating actual innocence "as a factual matter" because the petitioner's "self-defense claim [was] anchored by the district court's crucial credibility determination that [the witness] gave a trustworthy eyewitness." *Id.* at 644-45.

Here, the circumstances and substance of the affidavits do not satisfy Petitioner's burden. First, as the magistrate judge noted, Turner's assertion that he was coerced lacks credibility in light of the fact that he was accompanied by counsel during his police interview. Second, the Court agrees that Daniels's affidavit does not reveal new evidence because the substance of the testimony was presented to the jury. Again, the magistrate judge's analysis persuades the Court and Petitioner

-10-

is not entitled to habeas relief for a violation of the due process clause.

C

With respect to Petitioner's third basis for relief, Petitioner contends that Michigan courts misapplied legal authority and the trial court considered inaccurate information when it scored Petitioner's second-degree murder conviction as premeditated in contrast to the jury's finding. The magistrate judge concluded that the trial court's calculation of Petitioner's sentence under Michigan's sentencing guidelines is not cognizable on habeas review and that Petitioner has not demonstrated that the trial court considered inaccurate information when sentencing Petitioner. Dkt. # 21 at 20-21.

Petitioner's objection advances three arguments in response. First, the trial court erred when it did not hold an evidentiary hearing after he filed the aforementioned motion for relief from judgment pursuant to Mich. Ct. R. 6.502. As discussed above, "post-conviction proceedings are outside the scope of federal habeas corpus review." *Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007)(citing *Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986)). Second, Petitioner has not offered any authority disputing the proposition that the improper scoring or the court of appeals's alleged misapplication of binding authority is not cognizable on habeas review. Third, Petitioner contends that the trial court considered inaccurate information. As noted by the magistrate judge, the burden is on Petitioner to demonstrate that the trial court actually relied on materially inaccurate information. *See* dkt. # 26 at 2021 (citing *Hanks v. Jackson*, 123 F. Supp. 2d 1061, 1074 (E.D. Mich. 2000)). While Petitioner contends there is "no evidence" to support the trial court's calculation, the objection has not identified any portion of the record that illustrates the trial court actually relied on materially inaccurate information. Thus, the magistrate judge's conclusion will

be adopted and this claim for relief is denied.

### D

Finally, Petitioner claims that he received ineffective assistance of counsel because his trial counsel did not: (1) interview and present the testimony of Kenneth Strauthers; (2) obtain medical records to support his claim that his confession was extracted through the use of physical coercion; (3) seek suppression of his statement on Fourth Amendment grounds; or (4) object at sentencing. The magistrate judge rejected each contention as a basis for granting habeas relief.

First, the magistrate judge found that Strauthers's affidavit – which provides that he was with Petitioner at a different location while the shooting occurred – to lack credibility. Dkt. # 21 at 24. The magistrate judge highlighted the fact that at trial Petitioner testified inconsistently with certain events described in Strauthers's affidavit. Moreover, the magistrate judge noted that the record does not support Petitioner's assertion that counsel should have investigated Strauthers because trial testimony – including that of Petitioner – did not indicate that Strauthers may have relevant testimony. *Id.* at 25.

In response, Petitioner's objection asserts that any inconsistencies between Strauthers's affidavit and Petitioner's testimony at trial are a result of his inebriation at the time of the shooting. He maintains that he now recalls that Strauthers's version of events is accurate. In addition, Petitioner contends that he did instruct counsel to interview Strauthers.

Notwithstanding Petitioner's assertions, the Court agrees that Petitioner has not demonstrated that his counsel's performance was objectively unreasonable or a reasonable probability that the error is "sufficient to undermine confidence in the outcome." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). While Petitioner

emphasizes counsel's duty to investigate, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

In total, the record does not demonstrate that counsel performed in an objectively unreasonable manner. Petitioner does not advance any portion of the trial record supporting his contention that it was apparent that Strauthers had relevant information. In addition, there is no evidence corroborating his alleged request for counsel to investigate Strauthers. In fact, the record indicates that Strauthers's true identity was not known at trial.

Next, Petitioner contends that his counsel erred by not requesting Petitioner's medical records, which Petitioner contends would have corroborated that his statements were a result of physical assault by police investigators. The magistrate judge concluded that this omission was harmless because Petitioner and another witness offered testimony consistent with physical coercion by police and that the timing and substance medical records would not have provided significant corroborative effect. Petitioner's objection contends that there is a "high probability" that the result would have been different if the medical records had been introduced. Despite this argument, the record indicates that evidence corroborating coercive behavior by police was considered and rejected by the jury. Moreover, it is unclear how the medical records, viewed retrospectively, support his claim of physical coercion.

Third, Petitioner contends counsel should have sought to suppress his statement because police violated the "knock and announce" rule. The magistrate judge rejected this argument, reasoning that suppression was not an available remedy for the alleged constitutional violation. Dkt. # 26 (citing *Hudson v. Michigan*, 547 U.S. 586, 590-99 (2006) and *People v. Stevens*, 597 N.W.2d

53 (1999)). While Petitioner contends that he required "a full and fair hearing" to address the violation, he has not demonstrated that the magistrate judge erroneously concluded that suppression was not an available remedy. Indeed, *Hudson* supports the conclusion that the exclusionary rule would not have been applied.

Lastly, Petitioner contends that counsel was ineffective when he did not object to the trial court's analysis during sentencing. As discussed above, the record does not indicate that the trial judge considered inappropriate information during sentencing. Again, the Court will adopt the recommendation.

VI

In total, the Court agrees with the magistrate judge' analysis, will adopt the report and recommendation, and deny the petition for writ of habeas corpus. The Court will also deny a certificate of appealability. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.

Moreover, a federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States,* 310 F.3d 900, 901 (6th Cir. 2002). For the reasons stated in this opinion, the Court will deny Petitioner a certificate of

appealability because he has failed to make a substantial showing of the denial of a federal constitutional right.

Accordingly, it is **ORDERED** that the report and recommendation [Dkt. # 21] is **ADOPTED**. Petitioner's objection to the report and recommendation [Dkt. # 26] is **OVERRULED**.

It is further **ORDERED** that the petition for writ of habeas corpus [Dkt. # 1] is **DENIED WITH PREJUDICE**.

It is further **ORDERED** that Petitioner's motion for an evidentiary hearing [Dkt. # 13] and motion for appointment of a blood splatter expert [Dkt. # 17] are **DENIED** as moot.

It is further **ORDERED** that a certificate of appealability is **DENIED**.

> s/Thomas L. Ludington
> THOMAS L. LUDINGTON
> United States District Judge

Dated: April 17, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 17, 2009.

> s/Tracy A. Jacobs
> TRACY A. JACOBS